## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **AMAL SELMAN,** | |
| **Plaintiff,** | Civ. No. 15–8575 (KM) |
| **v.** | |
| **CAROLYN COLVIN, Acting Commissioner of Social Security,** | **OPINION** |
| **Defendant.** | |

**KEVIN MCNULTY, U.S.D.J.:**

Amal Selman brings this action pursuant to 42 U.S.C. § 405(g) to review a final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. Selman alleges that she is entitled to benefits because she is unable to engage in substantial gainful activity because of arthritis, degenerative disc disease, right knee disorder, left shoulder tendinopathy, obesity, and diabetes. For the reasons set forth below, the Administrative Law Judge's ("ALJ") decision is AFFIRMED.

## I.   BACKGROUND

Selman, now in her late 40's, immigrated to the United States in 2000. She completed 12 years of primary and secondary school abroad, and understands "just a little bit" of English. Formerly employed as a cashier at Dunkin' Donuts, Selman has not worked since 2005 or 2006.[1] She left that job because she could not stand all day and needed to take care of her children. (R. 38-40, 148, 168)

Selman filed a DIB application on October 7, 2011, claiming that rheumatoid arthritis, knee problems, diabetes, and high blood pressure had

---

[1]       Pages in the administrative record (ECF no. 6) are cited as "R. __."

prevented her from engaging in substantial gainful activity since December 2, 2010.[2] (R. 64, 168). Her application was initially denied on February 8, 2012.[3] (R. 72) A hearing before ALJ Jack Russak was scheduled for January 9, 2014.

About a week before the hearing, Selman sent a letter to the ALJ claiming disability on the basis of "rheumatoid arthritis, herniated cervical discs with spinal compression, carpal tunnel syndrome, bilateral median motor neuropathy, left shoulder adhesive capsulitis, subscapularis tendinopathy, AC joint orthopathy, subdeltoid bursitis a tear in the right knee meniscus, peripheral vestibular dysfunction, and uncontrolled diabetes with diabetic retinopathy." (R. 215) The hearing, at which Selman testified and was represented by counsel, was held as planned. On March 19, 2014, ALJ Russak denied Selman's application. The Appeals Council denied her request for review on October 14, 2015, rendering the ALJ's decision the final decision of the Commissioner. Selman now appeals that decision.

## II.   DISCUSSION

To qualify for Title II DIB benefits, a claimant must meet the insured status requirements of 42 U.S.C. § 423(c). She must also show that she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted (or can be expected to last) for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A).

---

[2]     Selman first applied for DIB on September 22, 2009. That application was also denied.

[3]     There is no record of a reconsideration decision. (Pl. Br. 2) The record does include a Form SSA-3441-BK, which appears to have been filled out with the assistance of an attorney sometime after the initial denial. In that document, Selman states that she suffers "rheumatoid arthritis, herniated cervical disk, radiculopathy and carpal tunnel worse with joint pain and stiffness[,] and frequent and severe headaches." She also claims that her "diabetes is worse and now affects her vision and has damaged her eyes" and is afflicted by "abdominal pain and kidney impairment." (R. 178-87)

### A.   Standard of Review

This Court exercises a plenary review of all legal issues. *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). This Court adheres to the ALJ's findings so long as they are supported by substantial evidence. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (citing 42 U.S.C. § 405(g)). Where facts are disputed, this Court will "determine whether the administrative record contains substantial evidence supporting the findings." *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Zirnsak v. Colvin*, 777 F.3d 607, 610 (3d Cir. 2014) (internal quotation marks and citation omitted). Substantial evidence "is more than a mere scintilla but may be somewhat less than a preponderance of the evidence." *Id.* (internal quotation marks and citation omitted).

> [I]n evaluating whether substantial evidence supports the ALJ's findings ... leniency should be shown in establishing the claimant's disability, and ... the Secretary's responsibility to rebut it should be strictly construed. Due regard for the beneficent purposes of the legislation requires that a more tolerant standard be used in this administrative proceeding than is applicable in a typical suit in a court of record where the adversary system prevails.

*Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003) (internal citations and quotations omitted). When there is substantial evidence to support the ALJ's factual findings, however, this Court must abide by them. *See Jones*, 364 F.3d at 503 (citing 42 U.S.C. § 405(g)); *Zirnsak*, 777 F.3d at 610–11 ("[W]e are mindful that we must not substitute our own judgment for that of the fact finder.").

This Court may, under 42 U.S.C. § 405(g), affirm, modify, or reverse the Secretary's decision, or it may remand the matter to the Secretary for a rehearing. *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984). Outright reversal with an award of benefits is appropriate only when a fully developed

3

administrative record substantial evidence which, on the whole, establishes that the claimant is disabled and entitled to benefits. *Podedworny,* 745 F.2d at 221-222; *Morales v. Apfel,* 225 F.3d 310, 320 (3d Cir. 2000); *see also Bantleon v. Comm'r of Soc. Sec.,* 2010 WL 2802266, at *13 (D.N.J. July 15, 2010). Remand is proper if the record is incomplete, or if there is a lack of substantial evidence to support a definitive finding on one or more steps of the five step inquiry. *See Podedworny,* 745 F.2d at 221–22. Remand is also proper if the ALJ's decision lacks adequate reasoning or support for its conclusions, or if it contains illogical or contradictory findings. *See Burnett v. Comm'r of Soc. Sec.,* 220 F.3d 112, 119–20 (3d Cir. 2000); *Leech v. Barnhart,* 111 Fed. Appx. 652, 658 (3d Cir. 2004) ("We will not accept the ALJ's conclusion that Leech was not disabled during the relevant period, where his decision contains significant contradictions and is therefore unreliable."). It is also proper to remand where the ALJ's findings are not the product of a complete review which "'explicitly' weigh[s] all relevant, probative and available evidence" in the record. *Adorno v. Shalala,* 40 F.3d 43, 48 (3d Cir. 1994).

### B.    The Five Step Analysis

Under the authority of the Social Security Act, the Social Security Administration has established a five-step evaluation process for determining whether a claimant is entitled to benefits. 20 C.F.R. §§ 404.1520, 416.920. Review necessarily incorporates a determination of whether the ALJ properly followed the five-step process prescribed by regulations.

**Step one:** Determine whether the claimant has engaged in substantial gainful activity since the onset date of the alleged disability. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, move to step two.

**Step two:** Determine if the claimant's alleged impairment, or combination of impairments, is "severe." *Id.* §§ 404.1520(c), 416.920(c). If the claimant has a severe impairment, move to step three.

**Step three:** Determine whether the impairment meets or equals the criteria of any impairment found in the Listing of Impairments. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A. (Those Part A criteria are purposely set at a high level, to identify clear cases of disability without further analysis.) If so, the claimant is automatically eligible to receive benefits; if not, move to step four. *Id.* §§ 404.1520(d), 416.920(d).

**Step four:** Determine whether, despite any severe impairment, the claimant retains the Residual Functional Capacity ("RFC") to perform past relevant work. *Id.* §§ 404.1520(e)–(f), 416.920(e)–(f). If not, move to step five.

**Step five:** At this point, the burden shifts to the SSA to demonstrate that the claimant, considering her age, education, work experience, and RFC, is capable of performing jobs that exist in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91–92 (3d Cir. 2007). If so, benefits will be denied; if not, they will be awarded.

## C.   The ALJ's Decision

ALJ Russak determined that the claimed disability onset date was October 7, 2011.[4] The ALJ further determined that Russak was not under a disability, as defined in the Social Security Act, at any time from October 7, 2011 through the date of his decision, March 19, 2014. The ALJ's specific determinations may be summarized as follows. (R. 14)

### 1.   Step One

The ALJ found that Selman has not engaged in substantial gainful activity since October 7, 2011. (R 13)

---

[4]   Selman argues that the alleged onset date should have been amended to December 2010, although she does not suggest reversal is appropriate on that basis. For reasons stated below, the difference between a 2010 and 2011 alleged onset date would not affect the outcome of this appeal.

### 2. Step Two

The ALJ identified Selman's rheumatoid arthritis, degenerative disc disease, right knee disorder, left shoulder tendinopathy, obesity, and diabetes as severe impairments. (R. 16) On the other hand, ALJ Russak concluded that Selman's vertigo was not a severe impairment, noting that Selman's complaints were infrequent and lacked clinical support.[5] (R. 16-17)

### 3. Step Three

The ALJ determined that Selman's impairments did not meet or medically equal the severity of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A §§ 1.04 (disorders of the spine)[6], 1.02 (major dysfunction of joint)[7]; 2.07 (disturbance of labyrinthine-vestibular function)[8],

---

[5]   In findings not challenged here, ALJ Russak also determined that Selman's abdominal pain, hypertension, and hyperlipidemia were not severe impairments (the former having been remedied by a cystoscopy and the latter being controlled by medication). (R. 17)

[6]   Listing 1.01 provides:

*Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

OR

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

OR

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

[7]   Listing 1.02 provides:

*Major dysfunction of a joint(s) (due to any cause):* Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and

6

9.00 (endocrine disorders)[9]; and 14.09 (inflammatory arthritis)[10] (hereinafter, "Listing ___"). ALJ Russack made the following specific findings:

chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

    A. Involvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

OR

    B. Involvement of one major peripheral joint in each upper extremity (*i.e.*, shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c

[8]    Listing 2.07 provides:

    *Disturbance of labyrinthine-vestibular function (including Meniere's disease),* characterized by a history of frequent attacks of balance disturbance, tinnitus, and progressive loss of hearing. With both A and B:

    A. Disturbed function of vestibular labyrinth demonstrated by caloric or other vestibular tests;

AND

    B. Hearing loss established by audiometry.

[9]    Endocrine disorders are evaluated under the listings for other body systems. *See generally* Listing 9.00.

[10]    Listing 14.09 provides:

    *Inflammatory arthritis.* As described in 14.00D6. With:

    A. Persistent inflammation or persistent deformity of:

        1. One or more major peripheral weightbearing joints resulting in the inability to ambulate effectively (as defined in 14.00C6);

      or

        2. One or more major peripheral joints in each upper extremity resulting in the inability to perform fine and gross movements effectively (as defined in 14.00C7).

OR

    B. Inflammation or deformity in one or more major peripheral joints with:

        1. Involvement of two or more organs/body systems with one of the organs/body systems involved to at least a moderate level of severity

      and

        2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

OR

    C. Ankylosing spondylitis or other spondyloarthropathies, with:

**Right knee and left shoulder**: Noting that the objective medical evidence did indicate that Selman's knee and shoulder were impaired, ALJ Russak observed that there was no evidence that she is unable to ambulate[11] or perform fine and gross movements effectively.[12] (R. 17)

**Degenerative disc disease**: Although the ALJ acknowledged the severity of Selman's spinal disorder, he noted that the objective medical evidence did not indicate that her condition had resulted in consistent signs of motor, sensory, or reflex loss. (*Id.*)

---

    1. Ankylosis (fixation) of the dorsolumbar or cervical spine as shown by appropriate medically acceptable imaging and measured on physical examination at 45° or more of flexion from the vertical position (zero degrees);

    or

    2. Ankylosis (fixation) of the dorsolumbar or cervical spine as shown by appropriate medically acceptable imaging and measured on physical examination at 30° or more of flexion (but less than 45°) measured from the vertical position (zero degrees), and involvement of two or more organs/body systems with one of the organs/body systems involved to at least a moderate level of severity.

OR

  D. Repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:

    1. Limitation of activities of daily living.

    2. Limitation in maintaining social functioning.

    3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

[11] "Inability to ambulate effectively means an extreme limitation of the ability to walk; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." Listing 1.00B2b(1). An applicant's inability to effectively ambulate is indicated by their inability to walk without the use of a device; walk around the block at a reasonable pace; use standard public transportation; carry out routine activities, like shopping and banking; or the inability to climb a few steps at a reasonable pace with the use of a single hand rail. Listing 1.00B2b(2). The fact that an applicant can walk around their home without assistance does not, in and of itself, mean they can effectively ambulate in a work setting. *Id.*

[12] "Inability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." Listing 1.00B2(c). An applicant's inability to perform fine and gross movements is indicated by their inability to prepare simple meals and feed themselves, take care of their personal hygiene and sort and handle papers and files. *Id.*

**Vertigo**: Although, as noted above, ALJ Russak disposed of Selman's vertigo at step two, he went on to note that her condition did not meet the requirements of Listing 2.07 because the record did not contain any audiometry testing that demonstrated hearing loss. (*Id.*)

**Diabetes**: Selman's diabetes was not sufficiently severe, the ALJ ruled, because there was no evidence of that her condition resulted in "listing-level" retinopathy, neuropathy, renal involvement, or any other diabetes-related complication. He noted that Selman had laser surgery performed on her eyes, which seems to have improved her vision.[13] (*Id.*)

**Inflammatory Arthritis**: Here, too, the ALJ ruled that the objective medical evidence failed to demonstrate that Selman's arthritis rendered her unable to ambulate effectively.[14] ALJ Russak likewise found no evidence that Selman's arthritis resulted in consistent complaints of fatigue, fever, malaise, or involuntary weight loss, or marked limitations in the activities of daily living, social functioning, or concentration, persistence, or pace. (*Id.*)

---

[13]    There is no record of the laser surgery, but Selman confirmed at the hearing that she underwent laser surgery "a couple of times" because of her diabetes. (R. 52) She also told the Social Security Administration's consultative examiner that she has had two laser treatments for retinopathy.

[14]    In the context of immune system disorders like inflammatory arthritis, the inability to ambulate effectively means the same thing that it does in Listing 1.00B2b.

### 4.    RFC and Step Four –Ability to Perform Past Work

Next, ALJ Russak determined Selman's residual functional capacity ("RFC"):

> **4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defend in 20 CFR 416.967(a)[15] except that the claimant can occasionally climb ramps or stairs. She can never climb ladders, ropes, or scaffolds. She can occasionally stoop, crouch, or kneel. She can never crawl. She is limited to performing no overhead reaching with the left dominant upper extremity. She is limited to occasional handling (gross manipulation), fingering (fine manipulation) feeling, and reaching with the right non-dominant upper extremity. She must avoid all exposure to moving machinery and unprotected heights. She is limited to occupations that do not require complex written or verbal communications. She is limited to occupations that do not required frequent verbal communications or frequent telephone conversations. Due to physical fatigue, this individual is allowed to be off task 5% of the day in addition to regularly scheduled tasks.**

(R. 19) Because several of Selman's arguments pertain to evidence the ALJ considered in the process of determining her RFC, I briefly summarize the ALJ's evaluation of that record evidence.

ALJ Russak considered that a number of diagnostic tests performed on Selman's knee, shoulder, and spine between 2009 and 2013 documented impairments. In September 2009, the ALJ noted, magnetic resonance imagery (MRI) revealed mild disc bulging and mild spinal stenosis. That same month, an electromyography (EMG) "showed evidence of bilateral carpal tunnel syndrome, advanced on the left and mild to moderate on the right," although "nerve connection studies were unremarkable in the lower extremities." An MRI

---

[15]    "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. 416 967(a).

of her left knee also taken in 2009 showed ACL and MCL sprains, mild degenerative change, small joint effusion and mild tendon tendinosis and tenosysnovitis.[16] X-rays of Selman's spine, hands, and wrists performed in 2010 were unremarkable. In 2013, the ALJ observed that MRIs of Selman's spine and shoulder showed that her impairments persisted; indeed, the tests revealed mild to moderate disc degenerative change in her spine, as well as subscapularis inflammation, AC joint disease, and subdeltoid bursitis in her shoulder. The ALJ also noted that another EMG taken in 2013 showed bilateral neuropathy in her wrists and elbows. (R. 297-300, 332, 381, 410)

The ALJ also reviewed treatment records from November 30, 2010, to January 13, 2014, which were prepared by Dr. Dominic Maiello, Selman's rheumatologist. ALJ Russak noted that Dr. Maiello consistently reported that Selman complained of "mild generalized . . . swelling, stiffness and pain involving her hands/wrists, elbows/shoulders, and hips/knees and ankles"; "synovial swelling of the knees bilaterally without crepitus or pain" upon range of motion; and "mild spasm of the cervical/lumbar spines." The ALJ pointed out that Dr. Maiello almost always noted that he did not detect any neurological deficits and that Selman represented that she was "doing better" or "doing well." Taken as whole, the ALJ found, Dr. Maiello's records suggested that Selman's condition improved somewhat over time. (R. 262-295, 428)

In addition to Dr. Maiello's records, ALJ Rassuk reviewed treatment records prepared by Dr. Mary Ibrahim, M.D., an internist, who treated Selman's diabetes from late 2012 to May 2013. While these handwritten records are virtually illegible, the ALJ considered (as Selman contends)[17] that

---

[16]     Although there is no documentation of the surgery, Selman represented to Dr. Hoffman that she underwent arthoscopic knee surgery at some point to remedy the impairments in her right knee. (R. 242) At the hearing, she confirmed that the surgery occurred, and that a second surgery would occur. (R. 42)

[17]     It is in fact unclear whether Selman's diabetes is controlled or uncontrolled. In September 2013, Selman told Dr. Hoffman that she had been taking medication to control her diabetes and that her condition was "relatively well controlled." (R. 242) On the other hand, some three months later, Selman testified that her diabetes were not controlled. (R. 52)

Dr. Ibrahim reported that her diabetes was uncontrolled. But the ALJ again noted that other evidence indicated that Selman's vision was fairly normal and that she did not have neurological deficits in her lower extremities. (R. 21, 336-342)

The ALJ also summarized the results of a September 27, 2013 consultative examination performed by Dr. Alexander Hoffman, M.D. Although Dr. Hoffman found evidence of near-sightedness and retinopathy, bursitis of the left shoulder, and tenderness in cervical spine region and right knee, he noted that Selman had full range of motion of neck and a slightly diminished range of motion in her left knee and left shoulder. In her right hand, Dr. Hoffman found good grip strength and a full range of motion in right wrist, shoulder, and elbow. He reported that Selman can put weight on one leg at a time, walk on her heels, drive, perform household duties, and care for her three children. (R. 242-243)

In addition to the medical evidence, the ALJ also gave some weight to Dr. Hoffman's opinion that Selman could occasionally lift and carry up to 20 pounds, sit 5 hours, stand 1 hour, and walk 1 hour in an 8-hour workday; use her right hand for all activities; never reach overhead with her left hand; occasionally reach, handle, finger, feel, push and pull with her left hand; never climb ladders or scaffolds or balance; occasionally climb stairs and ramps, stop, kneel, crouch, and crawl; and her impairments did not affect her vision or hearing. (R. 247-251) That assessment was fairly consistent with the opinion of Dr. Mohammad Rizwan, M.D., the Department of Disability Services' ("DDS") physician consultant, who thought that Selman could perform light work, although his opinion was based on a record that included only the treatment notes of Dr. Maiello. (R. 64)

Against the backdrop of all this medical and opinion evidence, the ALJ evaluated Selman's January 9, 2014 hearing testimony, which was given with the aid of an interpreter. Selman testified that her medication gave her vertigo and left her sleepy; that she suffered from pain in her left shoulder, neck,

12

elbows, and right knees; that she can walk 4 to 5 blocks, stand for 15 to 20 minutes, and sit for 20 minutes; that her carpal tunnel syndrome caused numbness in her upper extremities, which caused her to drop things; and that she had difficulty going up and down stairs. Selman also testified that she can drive, sometimes does the dishes, and takes her kids to restaurants. She also said that she attempted to find other employment after leaving Dunkin' Donuts but was busy taking care of her children. (R. 21-22)

On this record, over five pages of thorough analysis, the ALJ found that Selman's impairments were real, but not disabling. In ALJ Rassuk's words:

> After careful consideration of the evidence, the undersigned finds that the claimants medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimants statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible . . . . Although the medical evidence contains diagnostic testing documenting the claimant's severe impairments, physical examinations and other evidence establishes that these conditions do not functionally restrict her ability to perform work related tasks to the degree alleged. As a primary example, the majority of examination notes from her treating physician, Dr. Dominic Maiello, only document mild symptomology with relatively modest positive clinical findings. Similarly, Dr. Alexander Hoffman recently conducted a consultative examination internal examination, which yielded generally unremarkable results. . . .

> Given the objective results of the MRIs of the claimant's right knee, lumbar spine, and cervical spine, and the results of the EMG of her upper extremities, the undersigned limited the claimant to performing a reduced range of sedentary work with the additional postural, manipulative, and environmental restrictions detailed in the residual functional capacity assessment. As elaborated in this decision, the claimant's musculoskeletal impairments do not inhibit the functional usage of her extremities to the degree alleged, as she has not exhibited signs of sensory or motor deficits during physical examinations. Similarly, her diabetes has not resulted in serious symptoms of neuropathy of

retinopathy. She maintains adequate control of her
conditions through conservative means, and further
possesses the ability to perform several activities of daily
living, including driving and childcare.

(R. 19-20)

In light of the RFC determination, the ALJ found that Selman had no
past relevant work. (R. 23)

### 5.  Step Five

Based on the testimony of a vocational expert, the medical-vocational
guidelines, 20 C.F.R. Pt. 404, Subpt. P, Appx. 2, and Selman's age, education,
work experience, ALJ found that Selman, within her RFC restrictions, was
capable of performing other work that existed in significant numbers in the
national and regional economy. (R. 24) Although the ALJ found that Selman
can adequately speak and understand English, the vocational expert testified
at the hearing that table workers, surveillance systems monitors, and call out
operators do not require frequent or complex verbal or telephone
communications and exist in significant numbers in national and regional
economy. (R. 24, 56-58)

### D.  Analysis

Selman attacks the ALJ's decision on several overlapping fronts: (1)
the ALJ failed to fully consider an extensive list of conditions, including vertigo,
median motor neuropathy, carpal tunnel syndrome, headaches, vision
problems, and medication side effects; (2) the ALJ erred in ruling that Selman's
inflammatory arthritis and vertigo failed to meet the requirements of Listing
2.07 and 14.09, respectively, at step three; (3) the ALJ failed to give adequate
weight to Selman's subjective complaints; and (4) the ALJ failed to recognize
that Selman cannot effectively communicate in English. Selman also argues
that the ALJ's RFC and step five findings are incorrect because of a
combination of errors (1)-(4).

### 1.   **Failure to Consider Conditions**

Selman primarily argues that ALJ Russak rejected vertigo too early in the five step process. Specifically, she claims that her vertigo should have made it to step three because only *de minimis* claims based on "slight abnormalities" may be screened out at step two. *See McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360-61 (3d Cir. 2004) ("The burden placed on an applicant at step two is not an exacting one. Although the regulatory language speaks in terms of 'severity,' the Commissioner has clarified that an applicant need only demonstrate something beyond 'a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work.') (citations omitted). Step two determinations will be upheld if supported by substantial evidence on the record as a whole. *Id.* Although I agree that Selman's vertigo should have progressed past step two, any error is harmless because ALJ Russak did in fact evaluate Selman's vertigo under the appropriate listing in step three.

Selman is correct that there is evidence tending to show that she suffers from some sort of vestibular disorder. A June 18, 2013 videonystagmography, for example, revealed evidence of peripheral vestibular dysfunction. Selman also reportedly complained of dizziness in a handful of notes prepared by her internist. (R. 338, 339)[18] In addition, she was hospitalized on November 26, 2013, due to dizziness. (R. 416-17). This evidence, I think, tends to show that Selman's vertigo was something more than a slight abnormality. While the ALJ properly noted that there was no evidence of impairment of central vestibular function and Selman had not complained of vertigo, loss of balance, or dizziness to either Dr. Maiello or Dr. Hoffman, that analysis probably belonged in step three rather than step two.

Again any error is harmless, however, since ALJ Russak did assess Selman's vertigo at step three and later in the RFC analysis. Even assuming

---

[18]     Recall that these handwritten notes are largely illegible, so the context, cause, or treatment of Selman's dizziness is not entirely clear.

that Selman could show a history of frequent attacks of balance disturbance, *see* Listing 2.07, the ALJ correctly ruled that there is no evidence of hearing loss established by audiometry. (R. 17) At any rate, in limiting Selman from "all exposure to moving machinery and unprotected heights" in the RFC analysis, the ALJ adequately accounted for bouts of dizziness or vertigo. (R. 19) So while Selman has identified a technical deficiency in the ALJ's stepwise analysis, I will not remand on that basis.

Selman's arguments about her other conditions or symptoms—*e.g.*, carpel tunnel, bilateral median motor neuropathy in the elbows and wrists, headaches, retinopathy, and medication side effects—are harder to pin down. In broad strokes, the argument seems to be that the "the ALJ erred in failing to fully or fairly evaluate all of the Plaintiff's individual and combined impairments at Steps 2-5." (Pl. Br. 15)[19] I disagree; the ALJ, in my view, did fairly consider all of Selman's symptoms at all stages of the stepwise analysis. In fact, as detailed below, the ALJ accounted for almost all of Selman's

---

[19]     The complete list—most of which appear to be the technical names of symptoms or conditions the ALJ did consider—is as follows: rheumatoid arthritis; peripheral vestibular dysfunction with dizziness and imbalance and vertigo; diabetic retinopathy, post laser treatment; bilateral carpal tunnel syndrome, median neuropathy severe headaches; herniated cervical discs; cervical radiculopathy; nystagmus; eye pain, high myopia, cataracts, canalithiasis of the posterior canal; multiple joint pains in neck, low back, heads, wrists, elbows, shoulder, knees, hips; swelling in wrists; muscle spasm in cervical and lumbar spine; right knee medial joint compartment degenerative changes, an ACL grade 2 sprain, a lateral meniscal anterior horn and degenerative changes with focal tear, an MCL grade 1 sprain, joint effusion, chondromalacia patella; popliteal tendon tendonitis and tenosynovitis, lumbar osteoarthritis with L4-5 spinal stenosis and bilateral neuroforaminal stenosis secondary to disc bulging, congenital pedicle shortening and facet joint and ligamentum flavem hypertrophy; hearing loss, cervical degenerative changes at C3-4, C4-5 and C5-6 left paracentral disc extrusion with vertical spinal cord compression and a C5-6 central disc protrusion with central subarachnoid CSF space effacement; sclerotic aortic root and pulmonary insufficiency; left shoulder adhesive capsulitis and subcapsilaris tendonopathy, AC joint arthropathy and subdeltoid bursitis; side effects of medications; diabetes, uncontrolled; and, finally, early dementia. (Pl. Br. 16)

        For what it is worth, Selman sent a letter to ALJ Russak a week before the hearing (on which the ALJ expressly relied in his opinion) suggesting that the main points of contention were Selman's degenerative disc disease, vertigo and arthritis. (R. 216) Here, Selman's briefs primarily address her vertigo, although she has somewhat widened the issues to include neuropathy, carpal tunnel syndrome, retinopathy, and medication side effects. (Pl. Br. 14-21) At any rate, I am convinced upon a review of the record as a whole that the ALJ adequately addressed all of Selman's relevant conditions and symptoms.

symptoms in the RFC analysis to the extent they were supported by evidence in the record as a whole.

Concerning Selman's bilateral median neuropathy and carpel tunnel syndrome, the ALJ specifically noted the diagnostic evidence showing that she suffers from impairment in her wrists and elbows. (R. 20) He weighed that evidence, as he was entitled to do, against the clinical examinations performed by Drs. Hoffman and Maiello, which did not reveal significant functional limitations. (R. 20-21; (R. 262-90 (noting that "mild swelling of the wrists with no pain [upon range of motion]" and "5/5" muscle strength); R. 243 (noting some limitations in her left extremity and no limitations in her right))[20] He also factored in Selman's neuropathy and carpel tunnel syndrome in the RFC. (R. 19 (limiting Selman to occasional handling, fingering, and feeling with her left upper extremity and frequent handling, fingering, and feeling with her right)) The ALJ therefore adequately accounted Selman's neuropathy and carpel tunnel syndrome.

With respect to her retinopathy, the ALJ acknowledged that Selman suffered from some visual impairments and had in fact undergone laser surgery to remedy it. (R. 242 (noting that Selman's vision was 20/30 in her right eye and 20/25 in her left)) Selman, the ALJ also noted, testified that she can drive, although she does so infrequently. (R. 43) Given the objective medical evidence and Selman's testimony, the ALJ did not fail to properly consider the evidence that Selman was visually impaired.[21]

---

[20]  There is some confusion over whether Selman is left-hand or right-hand dominant. While Selman testified that she is a lefty, Dr. Hoffman appeared to believe that she was a righty. (R. 54, 242-43). The ALJ's RFC determination in any event assumed that Selman was left-handed.

[21]  I note that the records of Keith Gurland, M.D., which the ALJ did not explicitly reference in his opinion, suggest that Selman complained of eye pain and suffered from cataracts. (R. 254-60) These handwritten notes, however, are largely illegible and confusingly dated. Moreover, the medical history questionnaire on which Selman relies to corroborate her eye pain complaints also indicates that she was not suffering from fatigue, join paint, arthritis, or diabetes at that time. (R. 60) Selman makes no argument that the ALJ failed to consider these records, but for completeness I note that I would reject such an argument.

Finally, the ALJ also did not fail to consider the side effects of Selman's medication or her headaches. For one thing, Selman provides no objective medical evidence that she suffered from headaches, or that she had medication side effects other than vertigo and fatigue. (R. 17) And, as in the case of Selman's neuropathy and carpel tunnel syndrome, the ALJ also accounted for bouts of vertigo and fatigue in the RFC. (R. 19 (limiting Selman from exposure to machinery and unprotected heights and allowing her to be off-task 5% of the day due to fatigue))

### 2.   Listing Analysis

Focusing on step three, Selman argues that her arthritis and vestibular dysfunction meet the requirements of Listings 14.09A2 and 2.07, respectively. Because I have already affirmed the ALJ's step three ruling as to Selman's vertigo and the relevant objective medical evidence of Selman's arthritis is detailed above, only the following point need be made here. Listing 14.09A2, which addresses inflammatory arthritis, requires persistent inflammation or deformity of "[o]ne or more major peripheral joints in each upper extremity" resulting in an "extreme loss of function of both upper extremities." Here, there is no evidence of extreme loss of function in even one arm, let alone both. As noted above, Selman is able to drive and perform household activities. Accordingly, the ALJ permissibly concluded that Selman's arthritis failed to meet the listing requirements.

### 3.   Subjective Complaints

Selman next argues that the ALJ improperly discounted her subjective complaints about her vertigo, visual impairments, and medical side effects. She specifically faults the ALJ for, in her view, unfairly disregarding her complaints solely on the basis of her limited work history. Here, too, I disagree; Selman's work history was one piece of evidence, but the ALJ did, as required, weigh all of the evidence regarding her various symptoms and resulting limitations.

A claimant's subjective complaints merit careful consideration, but the ALJ is not required to accept them uncritically. *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 363 (3d Cir. 2011) (citing 20 C.F.R. § 416.929). Rather, the ALJ is required to assess whether and to what degree such complaints are credible. Such credibility determinations are reserved for the ALJ:

> [W]hile an ALJ must consider a claimant's subjective complaints, an ALJ has discretion to evaluate the credibility of a claimant and arrive at an independent judgment in light of medical findings and other evidence regarding the true extent of the pain alleged by the claimant. Subjective complaints cannot alone establish disability.

*Gantt v. Comm'r Soc. Sec.*, 205 Fed. Appx. 65, 67 (3d Cir. 2006) (internal quotations and citations omitted). *See also* 20 C.F.R. § 404.1529(c); *Malloy v. Comm'r of Soc. Sec.*, 306 Fed. Appx. 761, 765 (3d Cir. 2009) (citing *Van Horn v. Schweiker*, 717 F. 2d 871, 873 (3d Cir. 1983)); *Davis v. Com'r of Soc. Sec.*, 240 Fed. Appx. 957, 960 (3d Cir. 2007).

The ALJ may reject subjective complaints, for example, if they are not credible in light of the other evidence of record. *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 433 (3d Cir. 1999). The ALJ is called upon to evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit her ability to perform basic work activities. *See* 20 C.F.R. § 404.1529(c)(2). As to that issue, "[o]bjective medical evidence . . . is a useful indicator." *Id.* The ALJ may also examine factors that

19

precipitate or aggravate the symptoms, medications and treatments, and daily living activities. 20 C.F.R. § 1529(c)(3).

The ALJ's credibility determination "must contain specific reasons for the finding reasons for the weight given to the individual's symptoms" and "be consistent with and supported by the evidence." SSR 16-3; *see also* 20 C.F.R. §§ 404.1529(b), 416.929(b). What is required overall is that the ALJ give the claimant's testimony "serious consideration," state her reasons for discounting it, and make "specific findings." *Rowan v. Barnhart*, 67 Fed. Appx. 725, 729 (3d Cir. 2003). Where that has been done, a reviewing court will defer to the ALJ's credibility determinations.

The ALJ here discharged that responsibility. His decision, supported by substantial evidence of record, represented a classic weighing of evidence to which the Court must defer. Among other things, the ALJ's determination that Selman's symptoms were not credible was based on (1) the mild to modest symptomology and functional limitations reported by Drs. Maiello and Hoffman; (2) Dr. Maiello's report that Selman's pain and discomfort improved over time; (3) Selman's laser eye surgery and fairly normal vision; (4) the lack of consistent complaints of dizziness or the inability to balance; (5) Selman's ability to drive, perform household activities and care for her children; and (6) the fact that, although she stated she left her job as a cashier because she could not stand for an entire work day, her initial application says that she left because she had to care for her children. (R.19-23) Within that constellation of factors, it is true that the ALJ also considered that Selman had no earnings besides the wages she was paid as a Dunkin' Donuts cashier. But the ALJ did not, as Selman suggests, disregard the credibility of her subjective complaints based on an evaluation of her character. The ALJ instead properly evaluated the intensity and persistence of Selman's complaints based on a searching review of the record as a whole.

Selman's back-up argument is that reversal is appropriate under SSR 16-3, which eliminated the term "credibility" from agency's sub-regulatory

20

policy to make it clear that that the "subjective symptom evaluation is not an examination of an individual's character." That guidance was issued after the ALJ issued his decision. Selman says that this is a retroactive change to the law that requires a remand for further consideration.

SRR 16-3, however, did not change the law. Under the new guidance, ALJs are still called on to (1) determine whether the individual has a medically determinable impairment that could reasonably expected to produce the individual's alleged symptoms and (2) evaluate the intensity and persistence of an individual's symptoms, all based on the evidence in record as a whole—exactly the responsibility with which they were charged under the agency's previous guidance. *Herrold v. Colvin*, Civ. No. 14-1142, 2016 U.S. Dist. LEXIS 5572, at *28-30 (N.D. Ill. April 27, 2016) ("[A] comparison [between SSR 16-3 and the old guidance, SSR 96-7] reveals substantial consistency, both in the two-step process to be followed and in the factors to be considered in determining the intensity and persistence of a party's symptoms. . . . Stated differently, 'the agency has had only one position, although it has expressed that position in different words.") (quoting *First. Nat. Bank of Chicago. V. Standard Bank and Trust,* 172 F.3d 472, 479 (7th Cir. 1999) (internal citations omitted). Furthermore, as noted above, this is not a case in which the ALJ improperly disregarded a claimant's subjective complaints based on an assessment of her character.

I will not remand this case for the ALJ to consider the effect of policy guidance that did not change the law as to an issue on which the ALJ did not commit error.

### 4.    Ability to Communicate in English

Selman also faults the ALJ for finding that she can adequately communicate in English. This argument, however, is significantly undermined by Selman's concession that she can understand and communicate in English. (Pl. Br. 26, Reply Br.5 ("The Plaintiff is not stating that she does not

communicate or understand some English") Even without this concession, there is ample evidence to support the ALJ's findings: (1) Selman took two years of English courses; (2) she worked for a brief period as a cashier at Dunkin' Donuts where she filled orders, took payments, and gave change; (3) she reported in her disability application that she can understand English; and (4) neither Drs. Maiello nor Hoffman indicated that they could not understand Selman or that she could not communicate to them the symptoms of her conditions. The ALJ's finding that she can communicate in English is therefore supported by substantial evidence. (R. 24, 39, 45-46, 156, 242, 290)

To be clear, ALJ Russak did not rule that Selman was fluent in English, or that her language skills would not limit her ability to perform effectively in certain occupations. Indeed, in the RFC determination, he acknowledged that Selman was limited to jobs that "that do not require complex written or verbal communications" or "frequent verbal communications or telephone communications." (R. 19) I therefore find no error here.

### 5.   RFC and Possible Jobs

Selman's RFC argument (*i.e.*, the ALJ failed to consider all of Selman's combined exertional and nonexertional limitations) is dependent on her earlier arguments concerning vertigo, arthritis, carpel tunnel, and communications difficulties. For reasons stated above, I find that substantial evidence supports the ALJ's decision regarding those impairments. I will decline, then, to vacate the ALJ's well-reasoned and thorough RFC finding.

With respect to step five, Selman argues that the hypotheticals posed to the vocational expert at the hearing were erroneously based on an finding that Selman is able to frequently reach, handle, or finger with both hands. This mischaracterizes the RFC as found by the ALJ. ALJ Russak found that Selman could *never* reach overhead with her left arm and *occasionally* handle, finger, and reach with her left dominant extremity and *frequently* handle, finger, and

reach overhead with her right non-dominant extremity. The RFC, in other words, doesn't treat Selman's left and right extremities equally, as Selman contends, but rather accounts for the particular limitations and impairments of each. Because the hypotheticals ALJ Russak posed to the vocational expert reflect that distinction, I find no error in the potential occupations the vocational expert testified Selman could work given her RFC limitations. (R. 56)

In the same vein, Selman argues that her impairments preclude her from working as a table worker, which she says requires frequent reaching, handling, and fingering with both hands. The Dictionary of Occupational Titles, however, does not state that the job must be done with two hands. What it does say is that table working is a sedentary occupation in which reaching, handling, and fingering may be required as little as one-third of the time and generally requires only minimal manual and finger dexterity. *Dictionary of Occupational Titles*, 739.687-182 (4th ed. 1991) That description fits within Selman's RFC limitations. I therefore find no error at step five.[22]

---

[22]    Selman also argues that her limitations preclude her from working as a call-out operator and as a surveillance systems monitor, which she says exceed her language and reasoning capabilities. It is true that the vocational expert's testimony that these jobs do not involve frequent complex written or verbal communications in English is in some tension with the actual description of these jobs. *See Dictionary of Occupational Titles*, 379.367-101 (noting that a surveillance systems monitor, who "monitors premises of public transportation terminals to detect crimes or disturbances," should be able to "read a variety of novels, magazines, atlases, [] encyclopedias[,] . . . safety rules, [and] instructions in the use and maintenance of shop tools and equipment", "[w]rite reports and essays with proper format, punctuation, spelling, and grammar, using all parts of speech", and "[s]peak before an audience with poise, voice control, and confidence, using correct English and well-modulated voice"); 237.367-014 (noting that a call-out operator, who "complies credit information, such as status of credit accounts, personal references, and bank accounts to fulfill subscribers' requests, using [a] telephone," should be able to speak, read, and write English at the same level as the surveillance systems monitor). At any rate, I need not resolve this issue because where, as here, there is least one job category that exists in significant numbers in the national economy, an individual is not disabled. 20 C.F.R. § 416.966(b).

## III.   CONCLUSION

For the reasons stated above, the ALJ's decision is AFFIRMED.

Dated: January 27, 2017

_____
**KEVIN MCNULTY**
**United States District Judge**